UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
GARY LA BARBERA, LAWRENCE KUDLA,
THOMAS GESUALDI, PAUL GATTUS,
THEODORE KING, CHESTER BROMAN,
FRANK FINKEL and JOSEPH FERRARA,
as Trustees and Fiduciaries of the Local 282
Welfare, Pension, Annuity, Job Training, and
Vacation and Sick Leave Trust Funds,

               Plaintiffs,             03-CV-1508 (SLT) (AKT)

       — against —

R. RIO TRUCKING a/k/a R. RIO TRUCKING, INC.,
MMK TRUCKING, INC., RIO PAVING and
ROAD SAVERS,

              Defendants.
-----------------------------------------------------------------x
GARY LA BARBERA, LAWRENCE KUDLA,
THOMAS GESUALDI, PAUL GATTUS,
FRANK FINKEL, JOSEPH FERRARA,
FRANK DIMENNA, and ROBERT CARLINO,
as Trustees and Fiduciaries of the Local 282
Welfare, Pension, Annuity, Job Training, and
Vacation and Sick Leave Trust Funds,

                           06-CV-1329 (SLT) (AKT)

              Plaintiffs,

       — against —

MMK TRUCKING, INC., and ROAD SAVERS,

              Defendants.
-----------------------------------------------------------------x
**TOWNES, United States District Judge:**[1]

### **MEMORANDUM and ORDER**

      Plaintiffs, as Trustees and Fiduciaries of the Local 282 Welfare, Pension, Annuity, Job

Training and Vacation and Sick Leave Trust Funds (the "Funds"), bring these two actions

---

[1]The Court gratefully acknowledges the assistance of a student intern, Nathaniel Friedman of
Cardozo Law School, in the preparation of this Memorandum and Order.

pursuant to provisions of the Employee Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. § 1001, *et seq.*, seeking to compel the defendants to submit to audits of their books and records and to collect contributions allegedly owed the Funds under the terms of collective bargaining agreements between Local 282 of the International Brotherhood of Teamsters ("Local 282") and defendants R. Rio Trucking ("RRT") and MMK Trucking, Inc. ("MMK"). The parties have resolved those claims relating to the production of books and records. Plaintiffs now move, and defendants cross-move, for summary judgment on the remaining claims, including those alleging that all of the defendants in these actions constitute a single employer or are alter egos of one another. For the reasons set forth below, all motions for summary judgment are denied in their entirety.

## BACKGROUND

The plaintiffs in this action are trustees and fiduciaries of the Funds, which are employee benefit plans within the meaning of Section 3(3) of ERISA, 29 U.S.C. §1002(3) (Plaintiffs' Revised Statement of Undisputed Material Facts pursuant to Local Civil Rule 56.1 ["Pl. 56.1 Statement"] at ¶¶4-5; Defendants' Statement in Opposition to Plaintiffs' Revised Statement of Undisputed Material Facts pursuant to Local Civil Rule 56.1 ["Def. 56.1 Opp."] at ¶¶4-5). The Funds were established pursuant to the terms of various collective bargaining agreements ("CBAs") between Local 282 and various employers who are required to make contributions to the Funds on behalf of employees engaged in covered employment (Pl. 56.1 Statement ¶5; Def. 56.1 Opp. ¶5). The Funds are maintained for the purpose of collecting and receiving contributions and providing retirement, health and welfare, job training, and sick leave benefits to eligible participants in accordance with a Trust Agreement which governs the operation of the Funds (Pl. 56.1 Statement ¶¶6-7; Def. 56.1 Opp. ¶¶6-7).

Of the defendants named in the two actions at issue, two have been signatories to CBAs with Local 282. The first of these defendants, RRT, was established by Richard Rio in 1995, and operated as an unincorporated entity from 1995 until at least 1998 (Pl. 56.1 Statement ¶¶8, 83; Def. 56.1 Opp. ¶¶8, 83). It is uncontroverted that RRT was a signatory to two CBAs with Local 282: the Nassau/Suffolk County Asphalt Agreement covering the period from July 1, 1993, through June 30, 1996, and the Nassau/Suffolk Heavy Construction and Excavating and Asphalt Industry Agreement covering the period from July 1, 1996, through June 30, 1999 (Pl. 56.1 Statement ¶13; Def. 56.1 Opp. ¶13). RRT never signed a CBA covering the period from July 1, 1999, to June 30, 2002, but took certain actions which, plaintiffs argue, "adopted" that CBA.

The second of these defendants, MMK, was established in 2001 (Pl. 56.1 Statement ¶89; Def. 56.1 Opp. ¶89) and, at times since then, has employed both truck drivers and operating engineers. Although the ownership of this corporation has changed in the years since its formation, the parties agree that the shares of MMK have been held, either exclusively or partly, by only two men: Jerome Ventura, a longtime friend of Richard Rio's brother, Frank Rio (Pl. 56.1 Statement ¶97; Def. 56.1 Opp. ¶97; Deposition of Jerome Ventura dated April 13, 2007 ["Ventura Dep."][Ex. 10 to the Declaration of Michael Bauman ("Bauman Dec.")] at 34), and William Evans, who was employed by Road Savers both before and after MMK was established (Pl. 56.1 Statement ¶208; Def. 56.1 Opp. ¶208; Deposition of William Evans dated Sept. 23, 2004 ["Evans Dep."][Ex. 11 to Bauman Dec.] at 6-7). MMK is a signatory to a series of Nassau/Suffolk Heavy Construction and Excavating and Asphalt Industry Agreements with

Local 282 covering the periods from March 15, 2001, to June 30, 2008 (Pl. 56.1 Statement ¶16; Def. 56.1 Opp. ¶16).[2]

With respect to the remaining defendants, the parties agree that neither Road Savers nor Rio Paving has ever had a contract with any union (Pl. 56.1 Statement ¶28 ; Def. 56.1 Opp. ¶28). Although the parties disagree as to the relationship between Rio Paving and Road Savers, they agree that Frank Rio owns both entities  (Pl. 56.1 Statement ¶65, 67; Def. 56.1 Opp. ¶65, 67). He established Rio Paving, an unincorporated entity, in 1983 and established and incorporated Road Savers in 1994 (Pl. 56.1 Statement ¶¶66-68; Def. 56.1 Opp. ¶¶66-68).

### The Terms of the CBAs

Local 282's CBAs with RRT and MMK covered all work performed by the drivers of trucks and other vehicles, and addressed the wages, benefits and working conditions for these employees (Pl. 56.1 Statement ¶¶17-18; Def. 56.1 Opp. ¶¶17-18).  The CBAs required, *inter alia*, that RRT and MMK make contributions to the Funds in specified amounts for each hour worked by their employees in covered employment (Pl. 56.1 Statement ¶¶23, 25; Def. 56.1 Opp. ¶¶23, 25).  The CBAs further required that the contributions due for a particular month be submitted within 45 days after the end of that month, and be accompanied by completed "remittance reports" (Pl. 56.1 Statement ¶29; Def. 56.1 Opp. ¶29).  The Funds rely on these remittance reports to determine the number of hours that the employees work in covered employment and the benefits due these employees (Pl. 56.1 Statement ¶30; Def. 56.1 Opp. ¶30).

As signatories to the CBAs, RRT and MMK were both subject to, and bound by, the terms of a Trust Agreement, which was incorporated by reference into their respective CBAs (Pl. 56.1

---

[2]MMK has also been party to at least one collective bargaining agreement with Local 138 of the International Union of Operating Engineers ("Local 138"), though that CBA is not at issue herein (Pl. 56.1 Statement ¶26; Def. 56.1 Opp. ¶26).

Statement ¶37; Def. 56.1 Opp. ¶37). This Trust Agreement permitted the Trustees to audit the "pertinent books and records" of any employer at any time (Pl. 56.1 Statement ¶38; Def. 56.1 Opp. ¶38). These audits permitted the Funds to verify the accuracy of the remittance reports by comparing them to the employer's own records of the numbers of hours worked by employees and the pay those employees received (Pl. 56.1 Statement ¶39; Def. 56.1 Opp. ¶39).

The CBAs which RRT and MMK signed with Local 282 also contained at least two provisions designed to prevent signatories from undercutting the union. First, the CBAs contained a provision prohibiting the employers from establishing, or participating in, a "doublebreasted operation within the geographical jurisdiction of Local 282" (Pl. 56.1 Statement ¶19; Def. 56.1 Opp. ¶19).[3] Second, the CBAs prohibited the employers from hiring outside trucks or equipment unless all of the employers' available and suitable trucks and equipment were already in use and, even then, required employees to "hire only from others whose drivers receive wages, working conditions, benefits and standards of employment at least as favorable as those contained" in the CBAs (Pl. 56.1 Statement ¶20; Def. 56.1 Opp. ¶20).

### *The Instant Actions*

In March 2003, plaintiffs filed the first of the two actions at issue herein – *LaBarbera v. R. Rio Trucking, et al*, No. 03-CV-1508 (henceforth, the "2003 Action") – principally alleging that RRT used both Rio Paving and Road Savers, and that MMK used Road Savers, to avoid their obligations under the CBAs (Complaint in 2003 Action ["2003 Complaint"] at ¶¶53-54). The 2003 Complaint alleges that the defendants in that action – RRT, MMK, Rio Paving and Road Savers – were "part of a group of trades or business[es] constituting a single employer sharing

---

[3]A double-breasted operation is one in which a single entity "operates a union company that bids on union contracts and a nonunion company that bids on nonunion contracts." *Local One, Amalgamated Lithographers of America v. Stearns & Beale, Inc.*, 812 F.2d 763, 770 (2d Cir. 1987).

'common control' with each other, and/or [were] alter egos" (2003 Complaint at ¶36).[4]

Specifically, the complaint alleges, on information and belief, that both Rio Paving and Road

Savers paid employees to perform work covered by the CBAs between RRT and Local 282, and

that Road Savers paid its employees to perform work covered by the CBAs between MMK and

Local 282, but that neither Rio Paving nor Road Savers made contributions to the Fund (2003

Complaint at ¶¶55-60). Plaintiffs principally seek to recover these contributions, relying on both

a "single employer" and "alter ego" theory. Alternatively, plaintiffs demand these contributions

as damages for the violation of the CBA's "double-breasting" restrictions.

In addition, the 2003 Complaint seeks to compel the defendants to produce various books

and records necessary to ascertain the amount of the contributions owed by the defendants. First,

plaintiffs demand production of the books and records for Road Savers and Rio Paving for the

period since March 2, 1995. In addition, plaintiffs demand production of RRT's records for the

period between July 1, 1999, and October 31, 2001. Although plaintiffs concede that RRT did

not sign a CBA with Local 282 for the period beginning July 1, 1999, plaintiffs contend that

RRT's post-June 1999 actions adopted this CBA.

In March 2006, plaintiffs filed the second action at issue herein: *LaBarbera v. MMK

Trucking, Inc.*, 06-CV-1329 (the "2006 Action"). Although the 2006 Action relates to a later time

period, this action contains many of the same allegations and claims set forth in the 2003 Action.

The 2006 Complaint principally alleges that the defendants, MMK and Road Savers, were "part

of a group of trades or business[es] constituting a single employer sharing 'common control' with

each other, and/or [were] alter egos" (2006 Complaint at ¶21). The complaint alleges, on

---

[4]The 2003 Complaint did not draw a distinction between RRT and an incorporated entity called
R. Rio Trucking, Inc. ("RRT, Inc."). Rather, the 2003 Complaint named these two entities as a
single party: R. Rio Trucking a/k/a/ R. Rio Trucking, Inc.

information and belief, that MMK used Road Savers to avoid its obligations under its CBAs with Local 282, implying that Road Savers' employees performed work covered by the CBAs between MMK and Local 282 (2006 Complaint at ¶40). Since neither MMK nor Road Savers made contributions to the Funds on behalf of these employees, plaintiffs seek to recover these contributions under both a "single employer" and "alter ego" theory. Like the 2003 Complaint, the 2006 Complaint also seeks to recover these contributions under the theory that MMK had violated the double-breasting prohibition in the CBA. In addition, the 2006 Complaint, like the 2003 Complaint, seeks to compel the defendants to produce various books and records necessary to ascertain the amount of the contributions owed by the defendants. Specifically, plaintiffs seek MMK's books and records for the period since July 1, 2002, and Road Savers' books and records for the period since June 26, 2003.

In June 2006, the parties to the 2006 Action entered into a "Stipulation of Consent to Audit," which effectively resolved those portions of the 2006 Action which sought an order compelling production of certain books and records. Under the terms of that stipulation, MMK agreed to permit plaintiffs to review its books and records for the period since July 1, 2002, and Road Savers agreed to permit plaintiffs to review its books and records for the period since June 26, 2003. The parties agree that the Funds' auditor has now completed an audit of MMK's books and records for the period between July 1, 2002, and December 31, 2005 (Pl. 56.1 Statement ¶56; Def. 56.1 Opp. ¶56). In addition, the Funds' auditor represents that it has completed an audit of Road Savers' books and records for the period between June 27, 2003, and December 31, 2005 (Declaration of Ken Jones dated Jan. 14, 2008 ["Jones Dec."] at ¶8 and Ex. C).

By stipulation dated August 13, 2007, and "so ordered" on August 20, 2007, the parties agreed to consolidate the 2003 and 2006 Actions. This Court subsequently granted the parties permission to cross-move for summary judgment in the consolidated cases. *See* Minute Entry

dated Sept. 17, 2007. Plaintiffs now move, and the defendants cross-move, for summary

judgment, with defendants Rio Paving and Road Savers, Inc. ("Road Savers") filing a joint

motion and RRT joining in a motion filed by MMK.

***The Instant Motions***

Plaintiffs' motion for summary judgment raises four points, only three of which need be

addressed below. First, plaintiffs argue that the undisputed evidence regarding RRT's post-June

1999 conduct demonstrates a "course of conduct indicative of an intent to be bound," and that this

Court should hold that RRT "adopted" Local 282's CBAs for the period from July 1, 1999,

through October 2001 (Plaintiff's Memorandum of Law in Support of its Motion for Summary

Judgment ["Plaintiff's Memo"] at 21). Second, plaintiffs assert that the undisputed material facts

establish that the defendants form a single, integrated enterprise, arguing both (1) that RRT and

Rio Paving and/or Road Savers comprise a "single employer" and (2) that MMK and Road Savers

constitute a "single employer." Third, plaintiffs move for summary judgment on their "alter ego"

theory, arguing both (1) that RRT and Rio Paving/Road Savers are "alter egos" of one another

and (2) that MMK and Road Savers are "alter egos."[5]

MMK's motion for summary judgment also raises four arguments. First, relying

principally on *Newspaper Guild of New York, Local No. 3 v. NLRB*, 261 F.3d 291 (2d Cir. 2001),

MMK argues it cannot be held liable for Road Savers' employees under the alter ego doctrine

because both MMK and Road Savers operated simultaneously (*See* Memorandum of Law in

Support of Defendant MMK Trucking, Inc.'s Motion for Summary Judgment ["MMK's Memo"]

at 40). MMK also argues, in the alternative, that plaintiffs have not adduced sufficient proof to

---

[5]Plaintiff's fourth point, which requests a judgment for delinquent contributions and damages, presupposes that this Court will grant summary judgment under either the second or third points. Accordingly, this point need not be addressed separately.

establish that MMK is the alter ego of Road Savers. Second, MMK argues that plaintiffs' single employer theory must fail because (1) there is insufficient evidence to establish that MMK and Road Savers comprise a "single employer" and (2) MMK and Road Savers do not comprise an appropriate employee bargaining unit (*Id.* at 42). Third, construing the cause of action in which plaintiffs allege a breach of the CBAs double-breasting prohibition as a state law claim, MMK argues that this "common-law contract claim[]" is preempted both by ERISA and by section 301 of the Labor Management Relations Act ("LMRA") (*Id.* at 46). Fourth, MMK argues that plaintiffs have not adduced evidence that MMK is RRT's successor.

Despite denying that it is RRT's successor, MMK nonetheless makes three arguments on RRT's behalf. First, MMK argues that plaintiffs have not adduced sufficient evidence to support a finding that RRT "operated as alter ego of Road Savers and/or Rio Paving" (MMK's Memo at 40). Second, MMK argues that RRT and Road Savers/Rio Paving "do not represent an appropriate bargaining unit" and, therefore, cannot be considered a "single employer" (*Id.* at 45). Finally, MMK argues that there is no evidence that RRT adopted the CBA covering any period after June 1999 (*Id.* at 48-49). RRT has not filed its own motion for summary judgment, but has simply joined in MMK's motion.

Defendants Rio Paving and Road Savers have jointly filed their own motion for summary judgment, raising four arguments which are largely distinct from those raised by MMK. First, these defendants argue that Section 302(a) of the LMRA prohibits them from making fringe benefit contributions on behalf of employees of MMK. Second, the defendants, citing to various cases pertaining to the joint employer doctrine, argue that plaintiffs cannot prove that they are a "joint and/or single employer with [MMK]" (Defendants Rio Paving and Road Savers, Inc., Memorandum of Law in Support of their Motion for Summary Judgment ["Rio Paving/Road Savers' Memo"] at 7). Third, Rio Paving and Road Savers assert that plaintiffs' evidence does

not establish that they engaged in a double-breasted operation, and that they should not be liable for any contributions. Fourth, the defendants argue that Road Savers cannot be held liable under the "alter ego" doctrine because it was incorporated before RRT and MMK were established (*Id.* at 15-16).

## DISCUSSION

### *Standard of Review*

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir. 1999) (internal quotation marks omitted).

Upon a motion for summary judgment, the moving party bears the initial burden of showing that there is no genuine issue of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant meets this burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990). The non-movant cannot avoid summary judgment "through mere speculation or conjecture" or "by vaguely asserting the existence of some unspecified disputed material facts." *Western World Ins. Co.*, 922 F.2d at 121 (internal quotation marks omitted).

In ruling on a motion for summary judgment, a district court does not weigh the evidence, but must "view the evidence in the light most favorable to the party opposing summary judgment,

... draw all reasonable inferences in favor of that party, and ... eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir.1996). "No genuine issue exists if, on the basis of all the pleadings, affidavits and other papers on file, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, it appears that the evidence supporting the non-movant's case is so scant that a rational jury could not find in its favor." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

### *RRT's Liability under the CBA effective July 1, 1999 to June 30, 2002*

Although plaintiffs' complaints primarily deal with issues of whether the non-signatories, Rio Paving and Road Savers, can nonetheless be held liable under the terms of CBAs signed by RRT and MMK, plaintiffs' first argument for summary judgment relates to the scope of RRT's liability. As noted above, it is undisputed that RRT was a signatory to two CBAs with Local 282, covering the period from July 1, 1993, through June 30, 1999 (Pl. 56.1 Statement ¶13; Def. 56.1 Opp. ¶13). However, plaintiffs, principally relying on *Brown v. C. Volante Corp.*, 194 F.3d 351 (2d Cir. 1999), argue that RRT should be held liable for contributions during the period between July 1, 1999, and June 30, 2002, because it "adopted" Local 282's CBAs covering that period.

In their response to plaintiffs' motion, defendants agree that *Brown* "held that a party's conduct may manifest an intent to adopt, or agree to, an unsigned collective bargaining agreement." Defendants' Response Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment ("Defendants' Resp.") at 15. However, defendants argue (1) that "Plaintiffs' [2003] Complaint does not allege that RRT adopted a successor collective bargaining agreement," *id.*, and (2) that "the material facts clearly set forth that RRT did not intend to be bound to the 1999-2002 CBA." *Id.* at 16. MMK's motion for summary judgment echoes the first part of this

argument, asserting that "the Funds' Complaint does not allege that [RRT] adopted the 1999-2002 CBA." MMK's Memo at 49.

While the 2003 Complaint does not specify the CBAs which RRT signed with Local 282, this Court finds that it nonetheless provides adequate notice that plaintiffs seek to recover under the terms of the successor to the 1996-1999 CBA. The 2003 Complaint specifically alleges that RRT "was a signatory to a series of collective bargaining agreements with Local 282, effective for the periods from *at least* July 1, 1993 through *at least* June 30, 1999," and that, "[a]fter the expiration of the most recent collective bargaining agreement, [RRT] continued to submit remittance reports through October 2001." 2003 Complaint, ¶21 (emphasis added). Moreover, the 2003 Complaint specifically demands RRT's books and records for the period between July 1, 1999, and October 31, 2001, under the theory that RRT is contractually bound to produce these documents, *id.* at ¶10-11, and seeks to recover contributions from RRT for work performed by Rio Paving and Road Savers between March 2, 1995, and at least October 31, 2001, on the theory that RRT used these entities "to evade its obligations under its collective bargaining agreement with Local 282." *Id.* at ¶¶99, 104. Because these allegations imply that RRT was bound by the terms of a successor CBA until at least October 31, 2001, this Court finds that MMK's argument that plaintiffs have failed to "allege that [RRT] adopted the 1999-2002 CBA" is without merit.

Although plaintiffs have sufficiently alleged that RRT adopted a successor CBA, the undisputed evidence does not establish as a matter of law that RRT intended to adopt the successor agreement. RRT admits that it submitted monthly remittance reports to the Fund for hours worked by its drivers from March 1995 through November 1999, and for January and February 2000 and June and October 2001. 2003 Complaint at ¶26, Amended Answer at ¶12. However, the parties agree that RRT filed its last *positive* remittance report with the Funds in

April 1998. Defendants' Revised Joint Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Def. 56.1 Statement") at ¶316; Plaintiffs' Statement in Response to Defendants' Joint Statement Pursuant to Local Civil Rule 56.1 ("Pl. 56.1 Opp.") at ¶316. The parties also agree that either RRT or Richard Rio requested that the Funds remove RRT from the "active list" in February, October and December 2000, and in January and February 2001 before the Funds finally inactivated RRT in January 2002. Def. 56.1 Statement at ¶¶317-22, 324; Pl. 56.1 Opp. at ¶¶317-22, 324. In addition, it is undisputed that in June 2001, RRT advised the Funds that the company had been inactive since May 1998. Def. 56.1 Statement at ¶323; Pl. 56.1 Opp. at ¶323. Upon these facts, this Court cannot find as a matter of law that RRT adopted the successor CBA. Accordingly, plaintiffs' motion for summary judgment on this issue is denied.

### Plaintiffs' Theories of Liability

Before addressing the other issues raised in the parties' motions, this Court can dispose of three arguments which appear to be based on a misreading of the complaints in these actions. First, in their memorandum of law in support of their motion for summary judgment, Rio Paving and Road Savers state that plaintiffs' complaints allege that "Road Savers and/or MMK 'share an alter ego, single employer and/or joint employer relationship.'" Rio Paving/Road Savers' Memo at 14 (citing 2003 Complaint ¶36 and 2006 Complaint ¶21). Rio Paving and Road Savers seek, in Point II of their motion, to dismiss "the allegations of joint employer status." *Id.* at 7. However, plaintiffs deny that they are seeking to hold Rio Paving or Road Savers liable under a joint employer theory, Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Plaintiffs' Opp.") at 21, n.7, and 49, and this Court cannot find anything in the complaints, much less in the paragraphs cited by the defendants, to suggest that plaintiffs are

13

relying on this theory. Accordingly, this Court need not address Rio Paving and Road Savers' second argument.

Similarly, MMK's third argument – that plaintiffs' claims that RRT and MMK violated the "double-breasting" prohibitions in their respective CBAs are pre-empted by ERISA – is based on the assumption that these are "common-law contract claims." MMK's Memo at 46. However, plaintiffs have clarified that these, and all the rest of their claims, are advanced solely under ERISA. Plaintiffs' Memo at 50. Accordingly, this Court also need not address this argument.

Finally, Rio Paving and Road Savers' first argument for summary judgment – that section 302(a) of the LMRA, 29 U.S.C. §186, prohibits Rio Paving and Road Savers from paying benefits for employees of RRT or MMK – appears to ignore plaintiffs' theories of liability. Section 302(a) makes it "unlawful for any employer . . . to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value (1) to any representative of any of his employees who are employed in an industry affecting commerce; or (2) to any labor organization . . . ." 29 U.S.C. §186(1) and (2). Section 302(c)(5) creates an exception

> with respect to money or other thing of value paid to a trust fund
> established by such representative, for the sole and exclusive
> benefit of the employees of such employer, and their families and
> dependents (or of such employees, families, and dependents jointly
> with the employees of other employers making similar payments,
> and their families and dependents): *Provided,* That (A) such
> payments are held in trust for the purpose of paying, either from
> principal or income or both, for the benefit of employees, their
> families and dependents, for medical or hospital care, pensions on
> retirement or death of employees, compensation for injuries or
> illness resulting from occupational activity or insurance to provide
> any of the foregoing, or unemployment benefits or life insurance,
> disability and sickness insurance, or accident insurance; (B) the
> detailed basis on which such payments are to be made is specified
> in a written agreement with the employer . . . .

However, Rio Paving and Road Savers argue that this exception does not apply because "it does not authorize an employer to contribute to a trust fund 'on behalf of,' and 'for the benefit of,' individuals that are not employees of the contributing employer." Rio Paving/Road Savers' Memo at 6.

While this argument might have merit if plaintiffs conceded that Rio Paving and Road Savers were distinct from RRT and MMK, plaintiffs' theory in this case is just the opposite. Plaintiffs theorize that Frank Rio, the undisputed owner of both Rio Paving and Road Savers, "established and operated RRT and MMK chiefly to gain access to jobs requiring a CBA with Local 282 without having to provide his drivers with the benefits required by the CBA," Plaintiffs' Opp. at 2, and that all four defendants constitute a "single employer" or are "alter egos" of one another. If plaintiffs are correct in this regard, the exception in section 302(c)(5) would apply. Indeed, as discussed below, the single employer and alter ego doctrines provide that a non-signatory which is found to be a single employer with, or alter ego of, a signatory to a CBA can nonetheless be held liable for contributions to employee benefit plans under that CBA.

### The Single Employer and Alter Ego Doctrines

Under the single employer doctrine "a collective bargaining agreement may be enforced against [a] non-signatory employer if the employer constitutes a 'single employer' and if the employees of the companies constitute a single appropriate bargaining unit." *Brown v. Sandimo Materials*, 250 F.3d 120, 129 n.2 (2d Cir. N.Y. 2001). "Separate companies are considered a 'single employer' if they are part of a 'single integrated enterprise.'" *Id.* (citing *Lihli Fashions Corp. v. NLRB*, 80 F.3d 743, 747 (2d Cir. 1996)).

"The alter ego doctrine, while having the same binding effect on a non-signatory as the single employer/single unit doctrine, is conceptually distinct." *Id.*, 250 at 129, n. 3 (citing *Truck*

*Drivers Local Union No. 807 v. Regional Import & Export Trucking*, 944 F.2d 1037, 1046 (2d

Cir. 1991). "The focus of the alter ego doctrine . . . is on the existence of a disguised

continuance or an attempt to avoid the obligations of a collective bargaining agreement through

a sham transaction or a technical change in operations." *Id.*, 250 F.3d at 129 n.3 (quoting *Lihli*,

80 F.3d at 748). This is unlike the single employer doctrine, which focuses on whether two

entities are actually one.

      While it is clear that the alter ego and single employer doctrine are "conceptually

distinct," this distinction has proven difficult to articulate. *Sandimo Materials*, 250 F.3d at 129,

n.3. The Third Circuit attempted to draw a general distinction between the doctrines as follows:

> The single employer doctrine generally applies to situations where
> two entities concurrently perform the same function and one entity
> recognizes the union and the other does not. In making a single
> employer determination, the Board uses four criteria: interrelation
> of operations, common management, centralized control of labor
> relations, and common ownership. The alter ego doctrine, by
> contrast, examines seven objective criteria plus intent and usually
> comes into play when a new legal entity has replaced the
> predecessor (or at least the unionized portion of the predecessor)."

*Stardyne, Inc. v. NLRB*, 41 F.3d 141, 152 (3d Cir. 1994) (citation omitted). The Second Circuit

quoted this language with approval in *Newspaper Guild of New York, Local No. 3 v. NLRB*. 261

F.3d 291, 303 (2d Cir. 2001).

      In its first argument, MMK principally relies on *Newspaper Guild* in arguing that the

alter ego doctrine is inapplicable to entities that exist concurrently, and applies only when the

predecessor entity ceases to exist. However, *Newspaper Guild* did not hold that the alter ego

doctrine is unavailable in instances involving concurrent entities, but cited *Stardyne* for the

proposition that "the single employer doctrine *generally* applies" where union and non-union

entities concurrently perform the same function, and that "[t]he alter ego doctrine . . . *usually*

comes into play when a new entity has replaced the predecessor (or at least the unionized portion

of the predecessor)." *Id.*, 261 F.3d at 303 (emphasis added and omitted). In using the terms "generally" and "usually," *Newspaper Guild* implied that it was not establishing a categorical rule, but making a generalization. *Id.* (quoting *Stardyne*, 41 F.3d at 152. Additionally, the parenthetical, "or at least the unionized portion of the predecessor," suggests that a situation can exist where the alter ego doctrine applies to concurrently operating entities.

Moreover, MMK's first argument is contrary to respected authorities, including other Circuit Court opinions, which unequivocally hold that the alter ego doctrine can apply to entities that exist concurrently. For example, the First Circuit has ruled that the alter ego doctrine applies "where the companies are parallel companies." *Massachusetts Carpenters Cent. Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 307 (1st Cir. 1998). The Seventh Circuit and Eight Circuit have concurred, writing in the context of labor law cases that "limit[ing] the [alter ego] doctrine's applicability to companies which have shut down entirely would allow anti-union employers a complete escape from alter ego liability, simply by keeping a small aspect of the predecessor operation alive." *Central States, Southeast and Southwest Areas Pension Fund v. Sloan*, 902 F.2d 593, 597 (7th Cir. 1990) (quoting *Crest Tankers, Inc. v. National Maritime Union*, 796 F.2d 234, 238 (8th Cir. 1986)). In addition, a leading treatise – relying on a Sixth Circuit case – states that "[t]he alter ego doctrine may be applied in labor cases to so-called double-breasted operations to determine whether two or more *coexisting* employers performing the same work are in fact one business, separated only in form." 20 Richard A. Lord, *Williston on Contracts* § 55:19 (4th ed.1998) (emphasis added) (citing *Trustees of Resilient Floor Decorators Ins. Fund v. A & M Installations, Inc.*, 395 F.3d 244, 249 (6th Cir. 2005)). At least one court in this Circuit has expressly followed these authorities in holding that

the alter ego doctrine applies to entities that exist concurrently. *Puccio v. L.M.G. Air Corp.*, No. 94-CV-4013 (SJ), 1998 WL 887008 (E.D.N.Y. Dec. 8, 1998).

This Court concurs with the aforementioned authorities. The purpose of the alter ego doctrine is to prevent an employer from gaining an unearned advantage in his labor activities by evading his responsibilities under a CBA. Since this occurs whether companies are parallel companies or successor companies, the alter ego doctrine is applicable in either instance. Accordingly, this Court rejects that portion of MMK's first argument which urges this Court to dismiss plaintiffs' alter ego claims against MMK solely because MMK operated concurrently with other defendants.

Rio Paving and Road Savers also seek to dismiss plaintiffs' alter ego claims, implying in their fourth argument that Road Savers cannot be an alter ego of RRT or MMK because it was incorporated before these signatories were established. Rio Paving/Road Savers Memo at 16. However, the case on which Rio Paving and Road Savers principally rely – *Massachusetts Carpenters Cent. Collection Agency v. A.A. Bldg. Erectors, Inc.*, 343 F.3d 18 (1st Cir. 2003) – does not support this argument. In *A.A. Building Erectors*, the plaintiffs argued that it was "irrelevant whether establishment of the non-union entity followed or preceded the event giving rise to the obligation" to pay union benefits and that the alter ego doctrine could "apply *whenever* there has been some sort of corporate restructuring and a concomitant avoidance of an obligation." *Id.* at 21 (emphasis in original). The First Circuit expressly declined to rule on this argument, noting that it "need not disagree with the premise of this assertion in order to reject plaintiffs' argument that the *alter ego* doctrine should apply in this instance." *Id.* at 22. Moreover, as plaintiffs correctly note, both the First Circuit and courts in this Circuit have applied the alter ego doctrine in instances in which the non-union entity was established before

the union entity. *See Massachusetts Carpenters Cent. Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304 (1st Cir. 1998) (holding that a non-union entity, established in 1990, was the alter ego of a union entity established in 1992 and was, therefore, liable for the delinquent pension contributions of the union entity); *LaBarbera v. Cretty Enters., Inc.*, Consol. Civil Action Nos. 03-6112, 04-5178(DRH)(ARL), 2007 WL 4232765 (E.D.N.Y. Nov. 28, 2007) (holding a non-union entity established in 1989 to be the alter ego of a union company established in 1993, and holding the entities jointly and severally liable for delinquent contributions to union employee benefit plans).

Rio Paving and Road Savers also suggest that this case is analogous to *A.A. Building Erectors* because Local 282 did not "receive less than that for which it bargained." Rio Paving/ Road Savers Memo at 16 (quoting *A.A. Bldg Erectors*, 343 F.3d at 22). However, as noted above, *see* p. 15, *ante*, plaintiffs' theory is that Frank Rio, the undisputed owner of both Rio Paving and Road Savers, "established and operated RRT and MMK chiefly to gain access to jobs requiring a CBA with Local 282 without having to provide his drivers with the benefits required by the CBA." Plaintiffs' Opp. at 2. As discussed in more detail below, plaintiffs have supported that theory with testimony from Road Savers' drivers who, though not members of Local 282, were occasionally assigned to work for MMK at union sites. *See* Deposition of Robert Rudge dated Aug. 17, 2004 ("Rudge Dep.")(Ex. 17 to Bauman Dec.) at 22-23; Deposition of Patrick McGroary dated Sept. 28, 2004 ("McGroary Dep.)(Ex. 24 to Bauman Dec.) at 21-24. In light of this testimony, this Court cannot find as a matter of law that this is an instance in which the alter ego doctrine should not apply even if the relevant factors establish that Rio Paving and/or Road Savers are alter egos of entities which signed CBAs with Local 282.

### The Factors to be Considered in Analyzing Single Employer and Alter Ego Claims

The parties largely agree on the factors that this Court must consider in assessing

plaintiffs' single employer and alter ego claims. With respect to the single employer doctrine,

both plaintiffs and MMK cite to the test first set forth in *Radio & Television Broadcast*

*Technicians Local Union 1264 v. Broadcast Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965).

Under that test, courts look to four factors in ascertaining whether a group of companies is a

"single employer": (1) interrelation of operations, (2) common management; (3) centralized

control of labor functions and (4) common ownership. *See Sandimo Materials*, 250 F.3d at 129,

n.2. "[T]he use of common office facilities and equipment and family connections between or

among the various enterprises" is also relevant. *Lihli Fashions*, 80 F.3d at 747. However, "not

every factor need be present, and no particular factor is controlling." *Id.* "Ultimately, single

employer status depends on all the circumstances of the case and is characterized by absence of

an arm's length relationship found among unintegrated companies." *Id.* (internal quotations

omitted).

In order to bind a non-signatory to the terms of a CBA under the single employer

doctrine, plaintiffs must not only demonstrate that the non-signatory and a signatory to the CBA

constitute a "single employer," but also that the signatory and non-signatory comprise a "single

appropriate bargaining unit." *Sandimo Materials*, 250 F.3d at 129, n.2. In determining whether

the defendants' employees constitute a "single bargaining unit," courts look for a "community of

interests" among the relevant employees, and "factors such as bargaining history, operational

integration, geographic proximity, common supervision, similarity in job function and degree of

employee interchange." *Id.*

With respect to the alter ego doctrine, plaintiffs, MMK and Rio Paving/Road Savers all agree that the Second Circuit applies a six-factor test. Under this test, the court's inquiry "focuses on commonality of (i) management, (ii) business purpose, (iii) operations, (iv) equipment, (v) customers, and (vi) supervision and ownership." *New York State Teamsters Conference Pension & Retirement Fund v. Express Servs, Inc.*, 426 F.3d 640 at 649-50 (quoting *Newspaper Guild*, 261 F.3d at 294). In addition, "anti-union animus may be germane, or even a sufficient basis for imposing alter ego status but anti-union motivation is not necessary." *Sandimo Materials*, 250 F.3d at 128, n.3 (internal quotations and citations omitted). In evaluating these factors, "the focus . . . is on the existence of a disguised continuance or an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or a technical change in operations." *Id.* (quoting *Lihli Fashions*, 80 F.3d at 748).

Although the focus of the single employer and alter ego doctrines may be different, "the factors used to determine alter ego liability are similar to those relevant to the determination of single employer status." *Id.* Accordingly, this Court sees no need to separate its analysis of plaintiffs' single employer and alter ego claims, and analyzes the evidence relating to all factors below. This Court will first examine the factors with respect to RRT and Rio Paving/Road Savers, then analyze the factors with regard to MMK and Road Savers.

### RRT and Rio Paving/Road Savers

#### Common Management, Supervision and Ownership

Although the precise relationship between Rio Paving and Road Savers may be unclear, the parties agree that Frank Rio owns both Rio Paving and Road Savers (Pl. 56.1 Statement ¶65, 67; Def. 56.1 Opp. ¶65, 67).[6] The parties also agree that Frank Rio manages both Rio Paving

___

[6]The parties agree that Frank Rio established Rio Paving, an unincorporated entity, in 1983. Pl. 56.1 Statement ¶66; Def. 56.1 Opp. ¶66, and established and incorporated Road Savers in 1994.

and Road Savers, and is responsible for hiring, supervising and disciplining the employees of both entities (Pl. 56.1 Statement ¶¶98-100; Def. 56.1 Opp. ¶¶98-100).

There is no such consensus with respect to RRT. The parties agree that RRT operated as an unincorporated entity from at least 1995 through at least 1998, Pl. 56.1 Statement ¶8; Def. 56.1 Opp. ¶8, and that Frank Rio's brother, Richard Rio, operated RRT from 1995 to 1998. Pl. 56.1 Statement ¶83; Def. 56.1 Opp. ¶83. They also agree that an entity named R. Rio Trucking, Inc., ("RRT, Inc.") was incorporated by Frank Rio in 1998. Pl. 56.1 Statement ¶87; Def. 56.1 Opp. ¶87. There is a genuine issue of material fact, however, regarding whether RRT, Inc., is the incorporated successor of RRT. Defendants principally rely on testimony from Richard Rio, who denied knowingly transferring RRT to his brother, Deposition of Richard Rio dated Aug. 16, 2004 (Richard Rio 2004 Dep.")(Ex. 7 to Bauman Dec.) at 84, and testified that he "shut [RRT] down in 1999 or 2000," after he went to work for J&J Sand and Gravel. *Id.* at 8, 12. However, Richard Rio's denial is equivocal in that it allows the possibility that Frank Rio "did something behind [his] back" to obtain RRT. *Id.* at 84. In addition, there is evidence that RRT, Inc., provided labor and services to Newborn Construction ("Newborn") – formerly RRT's sole customer, *see* p 27, *post* – between 1998 and 2001, immediately after RRT allegedly ceased operating, Pl. 56.1 Statement ¶130; Def. 56.1 Opp. ¶130, and Richard Rio testified that he "turned [his brother] on to Newborn." Richard Rio 2004 Dep. at 60, 63.

---

Pl. 56.1 Statement ¶68; Def. 56.1 Opp. ¶68. However, there is a genuine issue of material fact regarding whether Road Savers is a corporate successor to Rio Paving. Carol Tankersley, who worked for Frank Rio for 13 or 14 years beginning in the early 1980's, testified that Frank Rio changed the name of the business when he incorporated it, saying "everything remained the same, just the name changed." Deposition of Carol Tankersley dated Sept. 23, 2004 ("Tankersley Dep.")(Ex. 23 to Bauman Dec.) at 8. While Frank Rio admits that Rio Paving began transferring its business to Road Savers in the 1990's, Pl. 56.1 Statement ¶75; Def. 56.1 Opp. ¶75, he testified that Rio Paving was still operating in 2000. Pl. 56.1 Statement ¶71; Def. 56.1 Opp. ¶71.

There is not only disagreement as to whether RRT, Inc., is a successor to RRT, but a genuine issue of fact as to whether Richard Rio actually managed and controlled RRT. Although plaintiffs agree that Richard Rio operated RRT from 1995 to 1998, Pl. 56.1 Statement ¶83; Def. 56.1 Opp. ¶83, they have adduced circumstantial evidence to support their theory that Frank Rio "managed, controlled and financed" RRT as a "union arm[]" of his "paving enterprise," and was paid by Newborn through RRT to work on jobs requiring a CBA with Local 282. Plaintiffs' Opp. at 3. First, at his deposition, Richard Rio demonstrated a lack of familiarity with basic aspects of RRT. For example, he testified that RRT was a corporation, Richard Rio 2004 Dep at 12, but his 1997 tax return lists the business as "R. Rio Trucking," – not R. Rio Trucking, Inc. – and treated it as a sole proprietorship. Bauman Dec., Ex. 44.[7] He was also unaware whether the corporation was ever dissolved, stating, "I gave it to the attorney. I guess it is." Richard Rio 2004 Dep. at 12. Richard Rio's lack of business acumen was readily apparent to Robert Bard, an accountant who worked with both RRT and Frank Rio, and who testified that Richard was "very different" from his brother in that "Frank was a much better businessman." Deposition of Robert Bard dated Aug. 23, 2004 ("Bard Dep.") at 22-23.

Second, RRT made substantial, inadequately explained payments to Frank Rio and/or Road Savers. For example, Richard Rio testified that Newborn paid RRT $100,000, but that he "had to pay that to [his] brother and a percentage of that came off what [Richard] owed [Frank]." Richard Rio 2004 Dep. at 63. When pressed to explain what RRT had done to earn the $100,000, Richard Rio stated that he "didn't do nothing," and only "got a percentage of that

---

[7]In 1997, the IRS defined a sole proprietor as "someone who owns an *unincorporated* business by him or herself." *See* Internal Revenue Serv., Tax Guide for Small Business (Publication 334) (1997) (available at http://www.unclefed.com/IRS-Forms/1997/p334.pdf) (emphasis added).

$100,000, a commission." *Id.* at 65. Richard Rio then analogized the transaction to the sale of a car, stating:

> When you sell a car for someone, you get a commission. This
> would basically be the same thing, and that commission I never got
> because it knocked down the money that I owed him.

*Id.* A fact-finder could interpret this testimony as implying that RRT was billing and receiving payment for services that Road Savers performed for Newborn.

That implication finds further support in the testimony of at least one truck driver who claims that he performed work for RRT, but was supervised and paid by Road Savers. Richard Branigan, who claimed that he worked for RRT in 1997, 1998 and 1999, testified that Frank Rio always gave him his daily work assignments and told him which truck to drive, and that he was paid by Road Savers even when he was working for RRT. Deposition of Richard Branigan dated Oct. 18, 2004 ("Branigan Dep.")(Ex. 16 to Bauman Dec.) at 14-16, 86-87; Declaration of Richard Branigan ("Branigan Dec.")(Ex. 28 to Bauman Dec.) at ¶4. Defendants have attempted to impeach Branigan's testimony by adducing evidence that he disliked Frank Rio, whom he called a "flea bag," and had been convicted of criminal contempt for failing to obey a court order. *Id.* at 22, 25, 69-70. Defendants also counter with the testimony of Richard Rio, who claimed that RRT was a one-truck operation and that RRT never hired any other drivers (Richard Rio Dep. at 9-10). However, plaintiffs have introduced union records which appear to show that Branigan and another driver, Jerome Ventura, drove for RRT in 1998. Declaration of Theresa Cody dated Jan. 7, 2008 ("Cody Dec."), Ex. M.

### *Business Purpose and Equipment*

Despite this evidence that Road Savers drivers also worked for RRT, and evidence – summarized later in this section – that RRT used a dump truck owned by Road Savers,

defendants deny that Rio Paving and Road Savers had the same business purpose as RRT. The parties agree that RRT was engaged in the business of hauling paving materials to and from construction sites, suppliers and other entities. Pl. 56.1 Statement ¶61; Def. 56.1 Opp. ¶61. However, defendants deny that Rio Paving and Road Savers were engaged in this same business, relying on the testimony of Frank Rio for the proposition that these entities were engaged solely in the business of "[r]oad recycling, asphalt recycling." Def. 56.1 Opp. ¶62 (citing Deposition of Frank Rio dated Aug. 26, 2004 ["Frank Rio 2004 Dep."][Ex. 5 to Bauman Dec.] at 7-8).

It is also unclear whether RRT was engaged in any other activities. Michael Ennesser, the controller of Newborn, testified that 1998 invoices from RRT to Newborn indicate that RRT provided other services, such as "[r]ental of [a] patch master, some milling, some sweeping, preparing of concrete curbs." Deposition of Michael Ennesser dated Sept. 9, 2004 ("Ennesser Dep.")(Ex. 27 to Bauman Dec.") at 14-15. Yet, the parties agree that between 1995 and 1998, Richard operated RRT as a one-truck business. Pl. 56.1 Statement ¶116; Def. 56.1 Opp. ¶116.

It is undisputed that RRT rented its truck – a 10-wheel Mack dump truck – from Road Savers. *Id.* The record does not reflect the exact terms of the lease. At his deposition, Richard Rio recalled that he negotiated a written lease agreement between RRT and Road Savers, but could not recall any of the terms, other than the fact that the lease payment covered insurance and registration. Richard Rio Dep. at 15, 18. Richard Rio also could not provide a copy of the lease, saying he had "no idea" whether the lease still existed. *Id.* at 14. Even assuming the lease did exist, however, there would still be a genuine issue of material fact regarding whether this was a genuine lease or one drafted to disguise the scheme which plaintiffs accuse Frank Rio of masterminding.

***Interrelation of Operations and Office Facilities***

There are also genuine issues of material fact with regard to whether RRT and Rio Paving/Road Savers shared office space and personnel. The parties agree that both Rio Paving and Road Savers have their principal place of business at 614 Union Avenue, Holtsville, New York. Pl. 56.1 Statement ¶¶10-11; Def. 56.1 Opp. ¶¶10-11. The parties further agree that RRT maintained a place of business in Ridge, New York, Pl. 56.1 Statement ¶8; Def. 56.1 Opp. ¶8, but disagree about whether RRT also maintained a place of business at 614 Union Avenue. Plaintiffs principally rely on the deposition testimony of accountant Robert Bard, who testified that Rio Paving, Road Savers and RRT all had their offices at 614 Union Avenue. Bard Dep. at 31-32. However, while Frank Rio admits that his secretary, Carol Tankersley, did office work for RRT at the Union Avenue office, Frank Rio 2004 Dep. at 36, Tankersley herself testified that she only did "a little record keeping and typing . . . and union forms" for RRT "as a favor" to Richard Rio, and did not get paid for the work (Tankersley Dep. at 21-22).

In addition, plaintiffs contend, based on addresses appearing on RRT's 1998-2000 tax returns and on an invoice issued by Rio Paving in 1998, that Road Savers and RRT shared a post office box in Lake Ronkonkoma, New York. Pl. 56.1 Statement ¶128. However, since those tax returns were submitted by RRT, Inc., defendants contend that plaintiffs' evidence establishes only that Road Savers had the same post office box as RRT, Inc. – a corporation operated by Frank Rio. Def. 56.1 Opp. ¶128. Similarly, plaintiffs contend that Robert Bard, Road Savers' accountant, also performed accounting work for RRT (Pl. 56.1 Statement ¶141). However, defendants point out that Bard testified that he performed this work for RRT, Inc., not RRT (Bard Dep. at 70).

***Common Customers***

With respect to the final factor, commonality of customers, the issue is not so much whether RRT and Rio Paving/Road Savers shared a common customer, but whether that entity was a customer of both defendants at the same time. Richard Rio testified that Newborn was RRT's sole customer, Richard Rio 2004 Dep. at 19, and Frank Rio testified that he worked for Newborn sometime prior to August 2004. Deposition of Frank Rio dated Aug. 26, 2004 ("Frank Rio 2004 Dep.")(Ex. 5 to Bauman Dec.) at 44. The latter testimony is corroborated by an invoice dated December 12, 2003, in which Road Savers charged Newborn $4,250 for work performed in November 2003, and a check for this amount dated December 18, 2003. Bauman Dec., Ex. 79.

Defendants have produced evidence, however, suggesting that Road Savers obtained this customer from RRT. Richard Rio claimed that he obtained Newborn as a customer himself, stating, "I was talking to somebody there and they were looking for trucks steady, and I went there." Richard Rio 2004 Dep. at 20. He further testified that he referred Newborn to Road Savers "to help [his] brother out." *Id.* at 63. This testimony, if credited, would undercut rather than support plaintiffs' theory that Frank Rio "operated RRT and MMK as union arms of his paving enterprise that serviced Newborn, which paid RRT/MMK to work on many jobs requiring a CBA with Local 282." Plaintiffs' Opp. at 3. Since this Court cannot make credibility determinations upon this motion for summary judgment, this Court cannot determine whether this factor militates for or against plaintiffs' theory.

\*　　　\*　　　\*

In sum, this Court concludes that genuine issues of material facts make it impossible to perform the factor analysis necessary to determine whether RRT and Rio Paving/Road Savers comprise a single employer or are alter egos of one another. These genuine issues of material

fact also make it impossible to determine that RRT and Rio Paving and/or Road Savers do not constitute an appropriate bargaining unit. Accordingly, this Court cannot grant summary judgment to either plaintiffs or defendants with regard to plaintiffs' single employer and alter ego claims against RRT, set forth as the sixth and seventh causes of action in the 2003 Complaint.

## *MMK and Road Savers*

### *Common Management, Supervision and Ownership*

The parties agree that, technically, MMK and Road Savers are owned by different people. As noted above, it is undisputed that Frank Rio owns Road Savers, having established and incorporated Road Savers in 1994. Pl. 56.1 Statement ¶¶66, 68; Def. 56.1 Opp. ¶¶66, 68. It is also undisputed that ever since MMK was established in 2001, Pl. 56.1 Statement ¶89; Def. 56.1 Opp. ¶89, its shares have been wholly owned by William Evans and/or Jerome Ventura. Initially, Evans and Ventura each owned 50% of MMK. Pl. 56.1 Statement ¶90; Def. 56.1 Opp. ¶90. In 2003 and 2004, Evans owned 100% of MMK. Pl. 56.1 Statement ¶91; Def. 56.1 Opp. ¶91. In 2005, Ventura acquired 26.3% of the shares, leaving Evans with 73.7% of the corporation. Pl. 56.1 Statement ¶92; Def. 56.1 Opp. ¶92. In 2006, Ventura acquired the balance of MMK's shares, becoming the sole owner. Pl. 56.1 Statement ¶93; Def. 56.1 Opp. ¶93.

Although plaintiffs concede that MMK is not technically owned by Frank Rio, they theorize that Frank Rio "established and operated . . . MMK chiefly to gain access to jobs requiring a CBA with Local 282 without having to provide his drivers with the benefits required by the CBAs." Plaintiffs' Opp. at 2. Plaintiffs have adduced circumstantial evidence to support that theory, much of which relates to the close relationship between Frank Rio and MMK's principals. First, it is undisputed that, prior to starting MMK, both Ventura and Evans were employed by Frank Rio at Road Savers. Pl. 56.1 Statement ¶95, 146; Def. 56.1 Opp. ¶95, 146.

Evans testified that he worked for Road Savers for four or five years before starting MMK in 2001, and worked for Rio Paving before that. Deposition of William Evans dated Sept. 23, 2004 ("Evans Dep.")(Ex. 11 to Bauman Dec.) at 7. Ventura grew up with Frank and Richard Rio, who have known him for thirty years. Pl. 56.1 Statement ¶97; Def. 56.1 Opp. ¶97. Indeed, Ventura testified that he and Frank Rio have been friends for 35 years and tend to help one another. Deposition of Jerome Ventura dated April 13, 2007 ("Ventura Dep.")(Ex. 10 to Bauman Dec.) at 34.

Evans denies that he consulted with Frank Rio before starting MMK. Evans Dep. at 20. However, it is undisputed that Frank Rio assisted Ventura in starting up MMK, though Ventura does not recall the specifics. Pl. 56.1 Statement ¶211; Def. 56.1 Opp. ¶211. In addition, the parties agree that Road Savers' 2003 general ledger reflects that Road Savers loaned MMK $25,000 in July 2003. Pl. 56.1 Statement ¶251; Def. 56.1 Opp. ¶251.

Moreover, while MMK's corporate tax return for tax year 2002 indicates that Evans and Ventura both devoted 100% of their time to MMK, Pl. 56.1 Statement ¶210; Def. 56.1 Opp. ¶210, the record suggests otherwise. Evans testified that between 2001 and 2004, he spent only about half his time operating machinery for MMK and the other half operating machinery for Road Savers. Evans Dep. at 6. Indeed, the parties agree that as of 2007, Evans was employed as a foreman at Road Savers and had been so employed for the previous five years. Pl. 56.1 Statement ¶208; Def. 56.1 Opp. ¶208. Road Savers' payroll records reflect that Ventura worked for 400 hours for Road Savers in 2005. Pl. 56.1 Statement ¶206; Def. 56.1 Opp. ¶206. At the same time Evans, an operating engineer, was working for Road Savers, Frank Rio and his

brother, Steve Rio, were apparently working for MMK in the same capacity.[8]  The parties agree that Frank Rio was paid gross weekly wages of $1,296.00 by MMK throughout the period from June 2002 to the end of 2004, Pl. 56.1 Statement ¶243; Def. 56.1 Opp. ¶243, and that Steve Rio earned gross weekly wages of $1,296.00 from MMK for most of the period from June 2002 to June 2004.  Pl. 56.1 Statement ¶338; Def. 56.1 Opp. ¶338.  Indeed, it is undisputed that, while Ventura and Evans were MMK's only full-time, non-seasonal employees until 2004, Pl. 56.1 Statement ¶235; Def. 56.1 Opp. ¶235, W-2 forms issued by MMK for tax year 2003 indicate that Frank Rio was MMK's highest-paid employee, earning nearly $59,616 in wages.  Pl. 56.1 Statement ¶96; Def. 56.1 Opp. ¶96; Bauman Dec., Ex. 64 at 2.  In contrast, Evans earned $44,064 and Ventura earned $35,960 that year.  Bauman Dec., Ex. 64 at 1, 3.

Moreover, according to Ventura, Frank Rio was the only person to draw a paycheck from MMK in the first quarter of 2004.  Ventura Dep. at 25.  At his deposition, Ventura claimed that Frank Rio was the only person employed by MMK in the first quarter of 2004 because he could operate a bulldozer, Ventura Dep. at 26, and that Evans, MMK's only operating engineer, was too ill to do this work during this period.  Evans Dep. at 31.  However, since Evans did not testify precisely when his illness began, it unclear whether his illness would also explain why Frank Rio out-earned Evans – then sole owner of MMK – in 2003.

In addition to this circumstantial evidence, which creates a genuine issue of material fact as to whether Frank Rio was the *de facto* owner of MMK, there is evidence to contradict Evans' and Ventura's claims that they managed and supervised MMK.  Ventura testified that Evans was responsible for the operating engineers work under Local 138 and Ventura was responsible for

---

[8]Evans testified that he called Steve or Frank Rio if he needed an additional operating engineer (Evans Dep. at 14).

the trucking operations covered by Local 282. Pl. 56.1 Statement ¶196; Def. 56.1 Opp. ¶196. Evans corroborated this, testifying at his deposition that if MMK "need[ed] an operator for a machine, [he would] call an operator in." Evans Dep. at 16.

However, there is evidence that Frank Rio and Road Savers supplied MMK with personnel when Evans and Ventura alone could not handle the work. As noted above, Evans testified that Frank Rio himself worked for MMK when Evans was ill, and MMK's payroll records indicate that both Frank and his brother Steve earned $1,295.00 a week from June 2002 until sometime in 2004. Moreover, Patrick McGroary, who worked for Road Savers between 2000 and 2002, testified that "[i]f Jerry need an extra truck, he called up Frank and used me to drove [*sic*] for MMK." Deposition of Patrick McGroary dated Sept. 28, 2004 ("McGroary Dep.)(Ex. 24 to Bauman Dec.) at 24. When he was driving for MMK, McGroary was paid by MMK, and would sign into union sites as an employee of MMK. McGroary Dep. at 23.

There is also testimony that Frank Rio issued MMK checks and directed Road Savers employees to sign in at jobsites as MMK employees. For example, Robert Rudge, a truck driver who was hired by Frank Rio in early 2001 or 2002, testified that most of the sites to which he delivered materials were union sites, manned by union stewards who demanded to see his union card. Deposition of Robert Rudge dated Aug. 17, 2004 ("Rudge Dep.")(Ex. 17 to Bauman Dec.) at 12-13. At one point, after Rudge – a non-union driver – experienced difficulties with a union steward, Frank Rio told Rudge to say he was working for MMK, but had only been doing it for a few days. *Id.* at 22-23. Rudge testified that eventually Frank Rio issued him an MMK paycheck in order to enable him to join the union. *Id.* at 21. At his deposition, Rudge identified two checks which had been issued to him for overlapping seven-day periods in early September 2002 – one issued by Road Savers and one issued by MMK. Rudge testified that both checks had

been handed to him by either Frank Rio or his brother, Steve. *Id.* at 26-27. Rudge claimed that neither Ventura nor Evans ever gave him work assignments, *id.* at 32, and he believed that Frank told him where to go even during the weeks in which he received an MMK paycheck. *Id.* at 36.

Another Road Savers driver, Richard Branigan, testified that sometime in 2001, when he learned that he would be working on a Newborn Construction project and "needed a [union] book," Frank Rio issued him a MMK check and sent him to join Local 282. Branigan Dep. at 11. Branigan claims that, in 2002, he received three more paychecks through MMK, even though he was doing the same work and driving the same trucks he drove for Road Savers. Branigan Dep. at 11-13. Branigan testified that Frank Rio supervised him, regardless of who he was driving for. Branigan Dep. at 13.

Although defendants have produced evidence to impeach Branigan's credibility, *see* p. 24, *ante*, and Rudge admits that Frank Rio fired him in 2002, Rudge Dep. at 30, there is documentary evidence to corroborate Branigan's and Rudge's claim that Frank Rio issued MMK checks. The record contains an MMK check payable to Frank Rio, apparently signed and endorsed by Frank Rio himself. Bauman Dec., Ex. 66. Information on the back of that check indicates that it was cashed. *Id.* This suggests that Frank Rio could write checks for MMK – a fact wholly at odds with the evidence that Evans and/or Ventura were the sole owners. In light of this evidence and the evidence set forth above, this Court concludes that there are genuine issues of fact as to who actually managed and supervised MMK.

### *Common Business Purpose and Equipment*

A genuine issue of material fact also exists with regard to MMK's business purpose. The parties agree that MMK was engaged in the business of hauling paving materials to and from construction sites, suppliers and other entities. Pl. 56.1 Statement ¶64; Def. 56.1 Opp. ¶64.

However, according to Frank Rio, Road Savers was engaged solely in the business of "[r]oad recycling, asphalt recycling." Def. 56.1 Opp. ¶62 (citing Frank Rio 2004 Dep. at 7-8).

There is evidence, however, that directly contradicts defendants claim that Road Savers and MMK were engaged in different businesses. Ventura's deposition testimony characterizes the nature of MMK's business as being the same as Road Savers.' Ventura Dep. at 9. Similarly, Evans testified that he and Ventura "continued doing what they had been doing at Road Savers" when they started MMK. Evans Dep. 12. In addition, Rudge testified that he did the exact same job for Road Savers and MMK, Rudge Dep. at 23, and McGroary testified that MMK did the same type of work as Road Savers. McGroary Dep. at 25.

With respect to equipment, it is undisputed that until 2003, MMK never owned any trucks or equipment. Pl. 56.1 Statement ¶433; Def. 56.1 Opp. ¶433. Ventura testified that, when MMK first started up, it leased vehicles from Road Savers and Frank Rio. Ventura Dep. at 12; Evans Dep. at 23. That equipment was kept in Road Savers' yard on Union Avenue. Evans Dep. at 37, 40. However, there is no memorialized rental or lease agreement between MMK and Road Savers for the use of Road Savers' vehicles and equipment. Pl. 56.1 Statement ¶293; Def. 56.1 Opp. ¶293. Accordingly, as in the case of RRT, there is an issue of fact regarding whether this was a genuine lease.

Ventura claims that when he took control of MMK, he bought the trucks from Road Savers or Frank Rio and created FTU Leasing ("FTU"), a truck leasing company. Ventura Dep. 12-13. It is undisputed that FTU acquired several trucks from Road Savers in 2005. Pl. 56.1 Statement ¶440; Def. 56.1 Opp. ¶440. The parties also agree that MMK now leases trucks from FTU at the rate of $550 per day, Pl. 56.1 Statement ¶446; Def. 56.1 Opp. ¶446, and that three of the trucks are the same trucks that MMK has been using since 2003. Pl. 56.1 Statement ¶444;

Def. 56.1 Opp. ¶444. However, there is evidence that these trucks may also be used by Road Savers in that the "rated drivers" on FTU's insurance policy for its trucks include five Road Savers employees. Pl. 56.1 Statement ¶447; Def. 56.1 Opp. ¶447. It is unclear, therefore, whether the equipment currently used by MMK is the same as the equipment used by Road Savers.

### Interrelation of Operations and Office Facilities

As regards MMK's operations, there is a genuine issue of fact regarding whether MMK maintained a place of business at the same 614 Union Avenue address used by Road Savers. Plaintiffs maintain that MMK maintained a place of business there, citing to Tankersley's testimony that MMK's received mail at 614 Union Avenue, Tankersley Dep. at 25; Rudge's testimony that MMK "operates out of there," Rudge Dep. at 19; and numerous MMK checks and invoices listing that address, Bauman Dec., Exs. 29 and 32. Plaintiffs have also produced, *inter alia*, a signed remittance report in which Evans gave MMK's address as 614 Union Avenue, Holtsville, New York. Pl. 56.1 Statement ¶155; Def. 56.1 Opp. ¶155; Bauman Dec. Ex. 34 at 10. However, Evans testified that MMK initially operated out of its owners' homes, Evans Dep. 22, and Ventura testified that his office was at his home in Lake Ronkonkoma, New York, and that he has no other office. Ventura Dep. at 19, 47. Ventura expressly denied that MMK operated from 614 Union Avenue. Ventura Dep. at 50.

Even though defendants deny that MMK had a place of business at 614 Union Avenue, they concede that Frank Rio's secretary, Carol Tankersley, performed clerical work for MMK at no charge at the request of Ventura and Evans. Pl. 56.1 Statement ¶¶213-14; Def. 56.1 Opp. ¶¶213-14. For example, Tankersley used to assist Ventura in preparing the remittance reports that MMK submitted to the Local 282 Funds at no cost to either Ventura or MMK. Pl. 56.1

Statement ¶212; Def. 56.1 Opp. ¶212. In addition, between 2002 and 2006, Tankersley and her successor, Cherise Spector, repeatedly signed return receipts for certified delinquency letters that the Funds mailed to MMK at the 614 Union Avenue address. Pl. 56.1 Statement ¶¶184-85; Def. 56.1 Opp. ¶¶184-85. However, since it unclear how much work Tankersley actually did on behalf of MMK, it is unclear whether these undisputed facts would justify a finding that MMK and Road Savers had common operations.

There is undisputed evidence that Road Savers and MMK have used the same accountants. When it was first establish in 2001, MMK used Robert Bard, then also the accountant for Road Savers. Pl. 56.1 Statement ¶420; Def. 56.1 Opp. ¶420. Thereafter, Frank Rio referred MMK to another accountant, Joseph Grillo, Jr. Pl. 56.1 Statement ¶419; Def. 56.1 Opp. ¶419. The parties agree that Grillo prepared the corporate tax returns for both entities from 2002 to 2006. Pl. 56.1 Statement ¶416; Def. 56.1 Opp. ¶416. However, in light of the close relationship between the principals of Road Savers and MMK, it is unclear whether a reasonable fact-finder would find this to be evidence of common operations or merely coincidental.

Defendants have adduced considerable evidence to show that the trucks which MMK currently uses are parked in a different yard than are Road Savers' trucks. Ventura testified that the trucks MMK leases from FTU have been kept in a yard on Hawkins Avenue in Lake Ronkonkoma since they were purchased from Road Savers. Ventura Dep. at 18-19. Frank Rio testified that he parks his equipment at 614 Union Avenue, and denies that anyone else parks their equipment there. Frank Rio 2004 Dep. at 34. However, it is undisputed that the MMK rents the Hawkins Avenue property from an entity known as Road Properties, which is owned by Frank Rio. Pl. 56.1 Statement ¶¶289-90; Def. 56.1 Opp. ¶¶289-90. In light of this fact, there is a

genuine issue of fact regarding whether the truck yards are as distinct as defendants' evidence might otherwise suggest.

### *Common Customers*

As to the final factor, common customers, the evidence suggests that MMK and Road Savers had at least one customer in common: Newborn. Evans testified that as of September 2004, Newborn was MMK's only customer. Evans Dep. at 20. Indeed, according to Evans, MMK had never had any other customers as of that date. *Id.* at 22, 25. Three years later, Ventura testified that MMK had several customers other than Newborn, Ventura Dep. at 21, but stated that Newborn remained MMK's "main customer." *Id.* at 22.

As noted above, there is evidence that Road Savers worked for Newborn during the same time as MMK. *See* p. 26, *ante*. That fact alone, however, does not necessarily militate in favor of finding that Road Savers and MMK are alter egos of one another. Newborn's controller, Michael Ennesser, suggested that Newborn is a large general contractor, testifying that it employed as many as 200 people at the height of the season. Ennesser Dep. at 5-6. Accordingly, it is possible that MMK procured Newborn's business on its own, and not through Road Savers. Indeed, Evans implies that Ventura obtained Newborn as a customer independent of Road Savers, testifying that Ventura "had been in business apparently for a long time, so he knew a lot of people." Evans Dep. at 22.

*     *     *

In sum, this Court concludes that genuine issues of material facts make it impossible to perform the factor analysis necessary to determine whether MMK and Road Savers comprise a single employer or are alter egos of one another. These genuine issues of material fact also make it impossible to determine that MMK and Road Savers do not constitute an appropriate

bargaining unit. Accordingly, this Court cannot grant summary judgment to either plaintiffs or

defendants with regard to plaintiffs' single employer and alter ego claims against MMK, set

forth as the eighth cause of action in the 2003 Complaint and the fourth cause of action in the

2006 Complaint.

### Double-breasted Operation

In their third argument for summary judgment, Rio Paving and Road Savers seek

summary judgment with respect to the tenth cause of action in the 2003 Complaint, which

alleges a violation of the double-breasting prohibition in the CBA. However, in making this

argument, these defendants state that plaintiffs must prove "the same four . . . elements of both

the single employer and alter ego theory" – "common ownership; interrelation of operations;

common management; and centralized control of labor relations." Rio Paving/Road Savers

Memo at 12-13. As discussed at length above, there are genuine issues of material fact with

regard to these factors. Accordingly, this Court cannot grant Rio Paving/Road Savers summary

judgment with respect to this cause of action.

### MMK as Successor to RRT

Finally, in their fourth argument, MMK seeks summary judgment with respect the eighth

cause of action in the 2003 Complaint, in which plaintiffs allege that MMK is the successor to

RRT. In the context of an appeal by the National Labor Relations Board, the Second Circuit has

delineated a two-part inquiry for determining whether one entity is the successor of another. *See*

*Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 365 (2d Cir. 2000). Under this inquiry,

which the Second Circuit distilled from the Supreme Court's decisions in *NLRB v. Burns Int'l*

*Sec. Servs., Inc.*, 406 U.S. 272 (1972), and *Fall River Dyeing & Finishing Corp. v. NLRB*, 482

U.S. 27 (1987), a court must first determine whether there exists "'substantial continuity'

between the enterprises of the successor and the predecessor . . . ." *Hoffman*, 247 F.3d at 365. In determining whether there is "substantial continuity" between the enterprises, a court considers several factors: "whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers." *Id.* at 366. In the second part of the inquiry, a court must determine whether "the successor . . . hired a majority of the predecessor's employees at the time when the successor's workforce had reached a 'substantial and representative complement.'" *Id.* at 365 (quoting *Fall River Dyeing*, 482 U.S. at 47). If these two prongs are satisfied, then the successor employer is a legal successor. *Id.*

In arguing that it is not a successor to RRT, MMK primarily relies on the fact that it was not incorporated until 2001, approximately three years after Richard Rio ceased operating RRT and went to work at J&J Sand and Gravel. However, as noted above, there is a genuine issue of material fact regarding whether RRT, Inc. was the successor to RRT. *See* p. 22, *ante*. Moreover, there is evidence that RRT and MMK both were engaged in the business of hauling paving materials to and from construction sites, suppliers and other entities, Pl. 56.1 Statement ¶¶61, 64; Def. 56.1 Opp. ¶¶61, 64; both initially leased Road Savers' trucks; and, at least initially, had Newborn as their lone customer. Given the totality of circumstances, this Court cannot grant summary judgment to MMK with respect to the eighth cause of action in the 2003 Complaint.

## *CONCLUSION*

For the reasons stated above, all of the parties' motions for summary judgment are denied. Pursuant to this Court's Individual Motion Practices and Rules, the parties shall confer

and contact the Court with a proposed date for a pre-trial scheduling conference within thirty

(30) days from the date of this Memorandum and Order.

**SO ORDERED.**

_Sandra L. Townes_
SANDRA L. TOWNES
United States District Judge

Dated: September 30, 2010
      Brooklyn, New York